

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*/s/ Harlin DeWayne Hale*
**United States Bankruptcy Judge**

**Signed January 10, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| WN TRUCK STOP, L.L.C. a Corporation, | § | Case No. 10-33156-HDH-11 |
| d/b/a WILLIES PLACE | § | |
| | § | |
| Debtor. | § | |
| | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CONFIRMATION OF DEBTOR'S AMENDED PLAN OF REORGANIZATION AND SBL'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Over the course of several days, the Court held a hearing on confirmation of *Debtor's Amended Plan of Reorganization* (the "Plan") filed herein by the Debtor, WN Truck Stop, LLC ("WN" or "Debtor") on September 24, 2010 and on SBL's Motion for Relief from Automatic Stay filed herein on September 2, 2010. At the conclusion of the hearing, the Court took the matters under advisement, and asked counsel to submit findings of fact and conclusions of law, setting out their arguments based on the record made. After consideration, the Court makes the following findings of fact and conclusions of law:

1. On or about May 3, 2010 (the "Petition Date"), WN Truck Stop, LLC ("Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code ("Petition"), with the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court").  Before the Court is the Debtor's Modified First Amended Plan of Reorganization and SBL Capital Funding LLC's ("SBL") Motion for Relief from Stay.

2. The Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (G) and (L). The statutory basis for the relief sought is 11 U.S.C. §§ 362 and 1129.  The Court held the final hearing on SBL's Motion to Lift Stay and confirmation of the Debtor's Plan concurrently on December 6, 9, 10 and 13, 2010.

3. The Debtor is a Texas limited liability company which operates a roadside convenience store and truck stop under the name Willie Nelson's Truck Stop.  The Debtor opened the truck stop in late 2008.

4. SBL is a private direct lender sometimes called a "hard money lender" that specializes in short term real estate bridge loans to borrowers who are unable to access conventional financing due to creditworthiness and other high risk factors.  SBL does not make long term conventional real estate loans.  In fact, the terms of the loans that SBL makes are never more than 15 months in length.  Consistent with this practice, the Debtor approached SBL in late 2007/early 2008 about a loan to finance the completion of construction of its truck stop.  *See*, testimony of Steve Milona.

5. Terms were ultimately reached, and on February 20, 2008, Dennis G. McLaughlin, III, in his capacity as Chief Executive Officer and authorized representative of Earth Biofuels, Inc., a Member of the Debtor, executed a Secured Promissory Note in the

original principal amount of $4,750,000.00 (the "Note") with a maturity date of February 1, 2009, and a Deed of Trust and Security Agreement in favor of SBL (the "Deed of Trust"), granting SBL a first lien on real property located in Hill County, Texas (the "Real Property"). SBL is the owner, holder and beneficiary of the Note secured by the Deed of Trust covering the Real Property. SBL has properly perfected its first priority lien in the Property in accordance with applicable law and there is no dispute that it is the holder of the first lien. *See*, **SBL Exhibits 1 and 2** which are the SBL Promissory Note and Deed of Trust.

6. In February of 2009, the Debtor and SBL executed a Loan Modification and Extension Agreement ("Extension Agreement") which extended the maturity date of the Note until February 1, 2010. *See*, **SBL Exhibit 3.**

7. The Debtor defaulted on its obligations to SBL with regard to the Extension Agreement by failing to make the payment due on April 1, 2009. Since the inception of the loan and continuing through the hearing on confirmation of the Plan and the Lift Stay Motion, the Debtor has been irregular with its payment obligations under its loan with SBL. *See*, testimony of Carl Cornelius and payment history reflected in Debtor's demonstrative exhibits and testimony of Debtor's expert, Scott Barnes.

8. The maturity date of the Note as extended was February 1, 2010. The Note is currently due and payable in full, with the full principal balance of $4,750,000.00, and interest, costs and fees recoverable under the terms of the Note and Deed of Trust of $1,524,873.50 due and owing as of the Petition Date, for a total amount outstanding on the Petition Date of $5,889,041.60, with interest continuing to accrue post-petition at a per diem of $2,750.00. As of December 10, 2010, the total amount of accrued post petition interest that would be payable at the default contract rate is $524,875.00. *See*, SBL Amended Proof of Claim, testimony of Scott

Barnes. The Debtor did not offer expert testimony as to the value of the truck stop. The Debtor did attempt to offer an appraisal obtained by SBL. However, the Court sustained SBL's evidentiary objection to the Debtor offering this appraisal. The Debtor's principal testified that SBL's collateral exceeded its debt. The original proof of claim of SBL states a value of $6,700,000.00 for its collateral. For purposes of these findings, the Court finds the value of SBL's collateral to be $6.7 million. It is oversecured, and entitled to post-petition interest and charges under its note. The Debtor has made post-petition payments to SBL totaling $200,000.00. Accordingly, because SBL is oversecured, the total SBL debt that the Debtor must still satisfy, exclusive of fees and expenses as of December 10, 2010, is $6,247,215.00, plus any legal fees and expenses approved by the Court pursuant to 11 U.S.C. §506(b) and per diem interest of $2,750.00, which continues to accrue.

9. The Debtor has never been profitable and was unable to service or satisfy the SBL debt according to its terms prior to the Petition Date. The Debtor's adequate protection payments of $35,000.00 a month have been a full $10,000 less than the presumptive plan payment to SBL of $45,845.97 per month testified to by Scott Barnes. The Debtor had to borrow $35,000 from one of its owners, Willie Nelson, to make its September, 2010 adequate protection payment.

10. As of October 31, 2010, the Debtor had accumulated over $467,000.00 in post-petition trade debt and other payables. Ms. Seale, the Debtor's accountant, admitted that the Debtor had failed to include the aging of this post-petition debt as required by the MOR form. Ms. Seale testified that at least some of the post-petition debt was not within terms. *See*, Seale testimony.

11. Ms. Seale also testified that in addition to the $467,000 plus in post-petition payables, the Debtor expected to have over $120,000.00 in professional fee administrative

expenses that it could not pay on the Effective Date. Rather, the Debtor would need to pay its professionals over time.

12. Ms. Seale also testified that the Debtor did not have any cash reserved or escrowed for the payment of its ad valorem taxes for the 2010 tax year. Those taxes total $64,868.64. The Plan proposes to pay those over twelve (12) months at twelve percent (12%) interest. *See*, **Debtor's Exhibit 34**. Scott Barnes, the Debtor's expert testified that on a "normalized" basis, the Debtor's last three (3) months of operations yielded only an average of $48,000.00 per month in operating cash flow. *See*, Barnes Report, p. 18, **Debtor's Exhibit 26**.

13. The total monthly Plan payments the Debtor is obligated to make at the inception of its Plan is approximately $58,500.00, using an 18% default interest rate for SBL. *See*, **Attachment 9** to the Barnes Report and his testimony. This does not include any payments required to be made on the $587,000.00 plus in post-petition trade debt and professional fees. Even if one assumes the professionals will accept payments over a year, the professional fees alone will add $10,000 per month in required monthly payments by the Debtor, plus whatever amounts out of current cash flow that must be used to pay the accrued post-petition trade debt.

14. The Plan projections do not contemplate any ongoing working capital reserve for post-confirmation taxes or replacement of equipment, etc. Instead, the Debtor relies on the Cash Flow Support Agreements of Mr. Nelson and Mr. Gilcrease, two of its equity holders, to make up for the certain cash shortfall that the Debtor will experience post-confirmation. These Agreements purport to obligate Mr. Nelson and Mr. Gilcrease to fund $150,000.00 each, for a total of $300,000.00. However, neither of the two agreements has a required schedule of payments, and instead, rely on Mr. Nelson's or Mr. Gilcrease's willingness to loan money to the

post-confirmation Debtor when asked. These agreements are substantially short of "cash in the bank" or commitments which the Debtor may enforce for any shortfalls.

15. Further, the Cash Support Agreements are expressly <u>not</u> a guaranty of the Debtor's Plan obligations and are not enforceable by any party except the Reorganized Debtor, which will be controlled by Mr. Cornelius. *See*, Cash Flow Support Agreements, ¶4

16. The Debtor proposes a rate of interest under its Plan for SBL's Allowed Secured Claim of six percent (6%). As set forth further herein, that rate does not provide SBL with the present value of its Allowed Secured Claim as required by Section 1129(b)(2)(A)(i).

17. The risk associated with this Debtor and its proposed SBL Plan note is greater than what a six percent (6%) rate implies. During the pendency of this case, the Debtor has had to borrow money to even make adequate protection payments to SBL post-petition. Those payments are almost $10,000.00 a month less than the Plan contemplates. Using a $6.7 million valuation, the loan to value ratio for the proposed SBL cram down loan is above ninety percent (90%). Mr. Kelly, SBL's expert, credibly testified that any LTV over ninety percent (90%) is effectively considered to be "no equity" by lenders in the market place. There was no controverting evidence from the Debtor on this point.

18. The Debtor's operations during this case raise feasibility concerns and issues about the proposed interest rate in the Plan. The Debtor has accumulated very little cash during the bankruptcy—it had $145,719.00 in cash on the Petition Date and Ms. Seale testified the Debtor's cash balance on December 2, 2010, is $188,000.00. It has thus averaged approximately $5,637.00 per month in added cash since the Petition Date while at the same time, it has not kept up with its post-petition payables (they are as high now as they were on the Petition Date), has not escrowed for its property taxes, has paid SBL approximately $10,000 less per month than it

proposes in the Plan, and has to cut deals on its professional expenses to pay them over time after the Effective Date since it has not paid them as incurred during the case.

19. SBL's expert, Mr. Kelly, opined his view as to how the market place would price the loan the Debtor proposes for its treatment of SBL's Allowed Secured Claim. While the approach used by Mr. Kelly necessarily employs a "hypothetical loan" analysis, given that both experts concede this Debtor cannot obtain any third party arms length financing in the market place, this is the best method to approximate as near as possible how the market would price the loan proposed by the Debtor, taking into account the Debtor's various risk factors. Using this approach, Mr. Kelly credibly testified the market would indicate that the cram down rate that would yield SBL the present value of its Allowed Secured Claim is 10.03%, not the 6% proposed by the Debtor.

20. The Debtor's expert, Mr. Barnes, admitted that the Debtor's Plan is not feasible at any rate of interest on SBL's Allowed Secured Claim above 6.5%. When Mr. Barnes used a blended rate analysis similar to that employed by Mr. Kelly, Mr. Barnes concluded the "market based" rate under this approach would be 7.25% or perhaps as much as 7.6%. Mr. Barnes' report notes that the Debtor's Plan is not feasible at a rate above 6.5% and thus he does not use the blended rate approach, not because it is not reflective of how the market would price the loan, but because the Debtor's Plan is not feasible at that rate. *See,* Barnes Report pp. 26-27. For purposes of the Plan's interest rate, Mr. Kelly's proposed interest rate appears on the high side. However, Mr. Barnes market approach, if accepted, yields an interest rate that the Debtor is unable to pay.

21. Due to the artificially low cram down rate proposed by the Debtor, the Debtor's poor operating history, its high leverage, lack of working capital reserves, and low cash flow, the Court finds that the Debtor's Plan is not feasible.

22. The above conclusions on interest rate and feasibility are not criticisms of the Debtor's principals or professionals. This Debtor's operations alone do not support repayment of the Debtor's obligations. The Debtor simply could not overcome the hard facts of the present economy.

*Summary*

23. Accordingly, because the proposed interest rate in the Plan does not provide SBL with the present value of its secured claim and because the pre and post-petition operations and projections indicate that the Plan is not feasible, confirmation of the Plan must be denied.

24. Because the Debtor has not and cannot propose a confirmable Plan in this case, SBL is entitled to relief from the stay as requested in SBL's Motion to Lift Stay which was heard concurrently with confirmation of the Plan.

25. Counsel for SBL shall upload an order denying confirmation and an order lifting the stay within 10 days from the date of entry of this order.

###End of Findings of Fact and Conclusions of Law###